# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

TAVON MOUZONE,     *

Plaintiff     *

v     *     Civil Action No. ELH-17-3102

ROBUSTIANO BARRERA, M.D.,     *
*et al.*,
Defendants     *

***

## MEMORANDUM OPINION

Tavon Mouzone, a self-represented Maryland prisoner, filed a civil rights suit against Robustiano Barrera, M.D. and Mahboob Ashraf, M.D.[1] He alleges the denial of constitutionally adequate medical care. ECF 1.

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment (ECF 11), supported by a memorandum (ECF 11-1) and many exhibits (collectively, the "Motion"). Plaintiff has filed an opposition (ECF 15) as well as a memorandum (ECF 15-1). Defendants replied (ECF 16) and filed another exhibit.

No hearing is necessary to resolve the motion. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, I shall construe the Motion as one for summary judgment and I shall grant it.

### I. Factual Background

A.     Plaintiff's allegations

Plaintiff alleges that after undergoing shoulder surgery in 2017 he was denied pain medication, a front cuffing order, and bandages. ECF 1 at 8. In support of his claim, he explains

---

[1] The Clerk shall amend the docket to reflect the correct spellings of defendants' names.

that from 2015 to 2017 he complained of back, neck, and shoulder pain. Eventually, on an unspecified date, after x-rays and medication did not resolve the issues, he was referred to Ray Carls, M.D., an orthopedic specialist. ECF 1 at 3.

In May of 2017, plaintiff was prescribed pain medication by Krista Swann to treat the chronic pain in his left shoulder and neck. The prescription expired on July 16, 2017. On July 18, 2017, plaintiff was transported to Western Maryland Medical Center for surgery. Plaintiff states that he was advised that he would undergo a procedure on his left shoulder rotator cuff[2] but, when he awoke from surgery, he was advised by custody staff that the procedure was done on his collar bone and his surgical scar crosses his collar bone. *Id*.

Plaintiff was returned to the Western Correctional Institution ("WCI") infirmary for post-surgical observation. On July 19, 2017, at approximately 10:00 p.m. he was given an injection for pain relief and was told that he would receive a shot every 8-12 hours until his prescription arrived. *Id*. at 3. The following morning, he was examined by "Dr. Barrera and given another shot." *Id*. at 4. Barrera approved his discharge from the infirmary and return to the North Branch Correctional Institution ("NBCI"), which occurred that afternoon. *Id*.

Plaintiff states that he received no pain medication until the afternoon of July 22, 2017, when custody staff called the medical office on his behalf. The officers explained the urgency of plaintiff's situation and he was escorted to the main building, where he was seen by medical staff and provided a shot of pain medication. *Id*. When plaintiff explained the situation to Nurse Travis, Travis allegedly responded: "How we suppose to give you a shot every 8-12 hrs. and we don't even have the staff for that." *Id*.

---

[2] Plaintiff refers to his left shoulder rotator "cup," but the Court believes he is referring to his rotator cuff.

Plaintiff reports that he was again escorted to the same building for another shot during the 11 p.m. to 7 a.m. shift. According to plaintiff, he advised unidentified medical personnel that the injection was not working. *Id*. at 4.

Further, Mouzone claims that on July 23, 2017, he received an injection in the morning. But, he did not receive another shot until the night of July 26, 2017. At that time, the nurse advised plaintiff that his Ultram had not arrived, but she was directed to give him two pills of Tylenol with Codeine. *Id*. at 5. On July 27, 2017, plaintiff again did not receive any pain medication. From July 28 to August 1, 2017 he received morning and nighttime doses of Ultram. Thereafter, no pain medication was provided. *Id*.

During this time, plaintiff filed sick call slips in an effort to receive adequate pain medication and in order to receive "front cuff paper work." *Id*. On August 12, 2017, in response to his girlfriend calling and speaking with Dr. Hassan and Bill Beeman, plaintiff was seen by a nurse. However, the nurse could not prescribe pain medication or provide paperwork regarding the cuffing and referred plaintiff to Dr. Ashraf. *Id*. On August 16, 2017, "defendant [presumably Dr. Ashraf] refused to provide [plaintiff] pain meds or front cuff paperwork. Instead the defendant opted to provide [plaintiff] a low grade muscle relaxer called Baclofphin." *Id*.

In explanation for plaintiff's desire for a front cuffing order, he states that when he returned to NBCI from his surgery he was placed in Housing Unit 1, the Special Needs Unit ("SNU"). When an inmate in the SNU is removed from his cell, he must be placed in restraints. *Id*. at 5-6. Despite the lack of a medical order to be front cuffed, the officers cuffed plaintiff in front because it was obvious that he just had surgery. *Id*. at 6. This continued until August 31, 2017, when Sgt. Gamel advised plaintiff that "medical specifically told him, 'not to front cuff me no more.'" *Id*. Plaintiff submitted numerous sick call requests seeking a front cuff order but was not seen. *Id*.

3

In addition, plaintiff alleges that after his surgery he did not receive proper bandage changes. *Id*. He was instructed not to remove his bandages for the first 48 hours after surgery. He states that he went two weeks without a shower due to his fear of contracting an infection from the shower. *Id*. He explains that the SNU houses segregation inmates as well as inmates with mental health issues who, in various areas of the prison, including the showers, regularly use bodily waste as weapons against other inmates and staff and/or "just play in" the waste. *Id*. at 6-7. The showers on the SNU are cleaned once a day, after all of the inmates have utilized them, by sanitation workers who do a poor job. *Id*.

Plaintiff indicates that using the showers posed a risk of harm to him due to the possibility of there being life threatening bacteria and given that the showers have black mold. *Id*. at 7. He explains that he would have been forced to use a shower with a fresh open wound after numerous inmates used the shower, without the shower being properly cleaned, and without his having access to anti-bacterial cream or fresh gauze to properly clean and wrap his wound. *Id*. Accordingly, plaintiff felt the best way to protect himself was not to go into the "contamination." *Id*.

B. Defendants' Response

In support of their Motion, Drs. Barrera and Ashraf submitted various exhibits, including their own affidavits, relevant portions of plaintiff's medical records, and the commissary menu describing over the counter medications available to plaintiff. ECF 11-2 (Discharge Instructions); ECF 11-3, ECF 11-6, ECF 11-7, ECF 11-8; ECF 16-1 (Medical Records 7/18/17-10/19/17); ECF 11-4 (Medical Diet Commissary Menu); ECF 11-5 (Ashraf Affidavit); ECF 11-9 (Barrera Affidavit).

Plaintiff was admitted to the WCI Infirmary on the evening of July 18, 2017, in preparation for left shoulder surgery the following day. ECF 11-6 at 2-4; ECF 11-3 at 6. Plaintiff underwent

4

arthroscopic surgery on his shoulder on July 19, 2017. ECF 11-5, ¶3; ECF 11-6 at 5, 8; ECF 11-9, ¶ 3. It was performed by an outside physician, Roy Carls, M.D. *See*, *e.g.*, ECF 11-3 at 6; ECF 11-6 at 2.

The discharge instructions, signed by plaintiff on July 19, 2017, provided that plaintiff could shower in 24 hours, he was to have ice and NSAIDs (non-steroidal anti-inflammatory drugs, e.g., ibuprofen, acetaminophen), a sling, and to begin occupational therapy exercises. ECF 11-2 at 2. He was to follow up with Dr. Carls at the next orthopedic clinic at the prison. *Id.* Dr. Barrera discharged plaintiff from the WCI infirmary on July 20, 2017. ECF 11-5, ¶ 3; ECF 11-9, ¶ 3.

Mouzone returned to the WCI infirmary the day of the surgery. ECF 11-6 at 5. At that time, Dr. Barrera gave verbal orders that plaintiff be held in the infirmary for 23 hours, and that he receive 600 mg of Motrin every 6 hours, as needed. *Id*. The prescription for Motrin was valid from July 18, 2017 to July 26, 2017. ECF 11-3 at 3. That night, plaintiff reported that his arm "really hurt," and he asked if he could have anything for pain. ECF 11-6 at 7. Dr. Ashraf ordered an injection of Toradol immediately, and then another shot in 12 hours, as needed, until the arrival of plaintiff's prescription for Ultram. *Id.*[3]

Dr. Ashraf avers that, given plaintiff's discharge instructions, and based on his medical training and expertise, plaintiff did not require higher levels of pain relievers, such as the narcotics plaintiff referenced in his compliant. ECF 11-5 at 2, ¶ 4. Dr. Ashraf states that although the higher level pain relievers were not medically necessary, "as a matter of courtesy," plaintiff was provided some narcotic pain medication for the first two days after the surgery and an order was placed for narcotic pain medication for the two weeks after the surgery. ECF 11-5 at 2-3, ¶ 6. Ashraf explains

---

[3] It is unclear from the medical records provided to the court who or when Tramadol/Ultram was prescribed for plaintiff and precisely when and why he failed to receive same.

5

that he has no control regarding whether a medication is provided to a patient by the pharmacy. ECF 11-5 at 3 ¶ 7. Plaintiff was permitted to purchase NSAID pain relievers through the prison commissary. ECF 11-5 at 2, ¶ 5; ECF 11-4 at 2.

Dr. Barrera avers that his only interaction with plaintiff during the time period at issue in the complaint was when he discharged plaintiff from the infirmary on July 20, 2017. ECF 11-9 at 2, ¶ 4. At the time of discharge it was noted that "pain medication is effective," plaintiff was to be seen by Dr. Carls at the next orthopedic clinic, and a request for physical therapy consultation was entered. Additionally, plaintiff had active prescriptions for Tramadol and Ibuprofen. ECF 16-1 at 3.

On July 22, 2017, plaintiff was evaluated by Marilyn Evans, RN due to his complaint of left shoulder pain. ECF 11-7 at 2. Evans examined the surgical site, noting that plaintiff had already removed the dressing. No drainage was observed and the incision, which was cleansed with saline, was intact with no redness or swelling noted. A new dressing was applied. *Id.* At that time, plaintiff had a valid prescription for Tramadol. He was advised to place a sick call if his symptoms changed. *Id*. Evans placed a referral for plaintiff to be seen by a provider for follow up. *Id*. at 4.

Plaintiff's dressing was changed on July 24, 2017, by Breauna Baker, RN. The incision was cleaned and a new dressing was applied. ECF 11-7 at 5.

On July 26, 2017, Dr. Ashraf entered an administrative note in plaintiff's medical records indicating that Mobic, a non-narcotic anti-inflammatory drug, had been ordered for plaintiff because he had not received his Tramadol due to insufficient supply. ECF 11-3 at 3; ECF 11-5 at 3, ¶ 8. Dr. Ashraf noted that he was informed by a case manager that plaintiff had not received his pain medication and the pharmacy was also informed. The pharmacy advised that it also did not have Mobic at the time but did have Tylenol with Codeine #3. ECF 11-3 at 3; ECF 11-5 at ¶ 8.

As a courtesy to plaintiff, Ashraf ordered Tylenol with Codeine for plaintiff for three days until the Mobic could be obtained (ECF 11-5 at ¶ 8) and noted in the chart that "pt will be getting this medication until he receives the Tramadol and Mobic." ECF 11-3 at 3. At that time, plaintiff had valid prescriptions for Mobic, Tylenol-codeine, and Tramadol. *Id*.

Plaintiff began physical therapy on August 3, 2017. ECF 11-8 at 2. At that time, the incision was healing well. *Id*. Plaintiff had prescriptions for Mobic and Tramadol. *Id*.

On August 12, 2017, plaintiff was seen by Stacie Mast, RN. Plaintiff indicated that he continued to have pain in his left shoulder and neck. Examination showed that he could move his upper and lower extremities without difficulty and was also able to turn from side to side. No swelling or bulging was seen in his neck and he was able to bend forward and back without difficulty. ECF 11-7 at 6. He indicated that his Ultram (Tramadol) ran out on August 3, 2017. *Id*. He did have a valid prescription for Mobic. *Id*. Mast referred plaintiff to the provider to have his Ultram (Tramadol) renewed. *Id*. at 7.

Dr. Ashraf evaluated plaintiff on August 16, 2017. ECF 11-3 at 4. Plaintiff complained of pain in his lower back. Dr. Ashraf noted that plaintiff continued to complain of pain at the surgical site. It was noted that plaintiff had been on Tramadol and Tylenol with Codeine but those prescriptions expired. Dr. Ashraf advised plaintiff that he could not be prescribed those medications for long periods of time due to their side effects. Accordingly, he prescribed Mobic and Baclofen, a muscle relaxer, to treat plaintiff's low back pain and any residual surgical pain. ECF 11-3 at 4; ECF 11-5 at 3, ¶ 9.

Plaintiff returned to Dr. Carls on August 31, 2017. ECF 11-3 at 6. He reported that his left shoulder felt better but he had "a little pain in the anterior aspect of his shoulder at times." *Id*. Dr. Carls noted that plaintiff was doing well, no longer needed to wear his sling, and recommended

plaintiff continue doing his therapy exercises and begin light weight training. *Id.* Dr. Ashraf avers that, based on his knowledge, training and experience, and given Dr. Carls' recommendations, it was reasonable for plaintiff to be cuffed in the rear at this time. ECF 11-5 at 3, ¶ 10.

Plaintiff was discharged from physical therapy on September 14, 2017, with a notation that plaintiff had obtained the optimum benefit from physical therapy. ECF 11-8 at 3.

## II. Standard of Review

A motion styled in the alternative, to dismiss or for summary judgment, implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But when, as here, the movant expressly captions its motion "in the alternative," as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C ALAN WRIGHT & ARTHUR MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed.)

8

("Wright & Miller). However, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-640 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). However, a nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, ___ F.3d ___, 2019 WL 350375, at *6 (4th Cir. Jan. 29. 2019); *Pisano v. Strach*, 743 F.3d 927,

9

931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Plaintiff has not moved for discovery in response to the dispositive motion. As such, I am satisfied that it is appropriate to address defendants' motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

11

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex*, 477 U.S. at 323-24).

### III. Discussion

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom*. *Balt. City Police Dep't v. Owens*, 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert*. *denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.");

13

*see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

The Eighth Amendment to the Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97.

The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer*, 511 U.S. at 837. Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). A "'serious ... medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40. As

the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted). Although this "'entails more than mere negligence ... it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id*. (quoting *Farmer*, 511 U.S. at 835).

In order "[t]o show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). As the *Farmer* Court explained, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). But, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105.

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.; Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences ... To lower this threshold would thrust federal courts into the daily practices of local police departments."). Moreover, mere negligence or malpractice does not rise to the level of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble, supra*, 429 U.S. at 106). And, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

In *Scinto*, the Fourth Circuit said, 841 F.3d at 226:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus must have known about it...." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

The evidence, viewed in the light most favorable to plaintiff, establishes that he received constitutionally adequate medical care. It is clear that Dr. Barrera and Dr. Ashraf, the only named defendants in this case, were not responsible for the interruption in plaintiff's receipt of his prescribed medication. Dr. Barrera's only interaction with plaintiff was when plaintiff was treated in the WCI infirmary for one day post-operatively. Before discharging plaintiff back to his housing unit, Barrera placed orders for analgesic pain medication and referrals for plaintiff to return for follow-up care with the orthopedic surgeon. There is no indication that Barrera knew that the medication prescribed to plaintiff was not provided.

Ashraf's interactions with plaintiff were more substantial, but it is clear that he endeavored to provide plaintiff with analgesic pain medication. When Ashraf was advised that plaintiff's pain

was not controlled while he was in the infirmary, he ordered that plaintiff receive injections of Toradol. After plaintiff returned to NBCI and his prescription for Ultram/Tramadol was not filled by the pharmacy, Ashraf prescribed Mobic. And, when that proved unavailable, he prescribed Tylenol with Codeine. When Ashraf next examined plaintiff, his Mobic prescription remained in place and Dr. Ashraf added Baclofen as an additional analgesic.

To the extent that plaintiff experienced difficulty in obtaining pain medication, it was not occasioned by Dr. Ashraf. Apparently, the pharmacy experienced shortages in medication. Each time Dr. Ashraf was made aware that plaintiff was not receiving his prescribed medication he took steps to provide other analgesic medication. Additionally, as the record reflects, plaintiff had access at all times to over the counter analgesic medication through the commissary, such as acetaminophen and ibuprofen.

Plaintiff's claim that he was not provided bandages is also unavailing. On at least two occasions his bandages were changed at sick call by a nurse. Had plaintiff required a bandage change he could have submitted a sick call slip seeking same. He could also obtain bandages through the commissary. There is no indication that either of the named defendants would have been responsible for changing the bandages or providing plaintiff with bandages. Those activities could have been and were in fact taken care of by lower level medical providers at sick call.

As noted, Dr. Barrera only provided medical care to plaintiff during his brief stay in the infirmary. Additionally, there is no indication that plaintiff complained to Dr. Ashraf at any time that he needed wound care or bandages. Plaintiff has not pointed to any injury arising from the lack of bandages, other than his avoidance of showering. His wound apparently healed well, as noted by Dr. Carls' examination of plaintiff on August 31, 2017.

19

Lastly, there is no evidence that plaintiff required a medically issued front cuffing order. Plaintiff explains that after his surgery until August 31, when he saw Dr. Carls for a follow-up examination, custody staff in fact cuffed him in front. Only after plaintiff saw Dr. Carls, who noted that plaintiff was healing well and authorized him to begin physical therapy and weight lifting, did custody staff stop accommodating plaintiff with front cuffing. They were advised at that time by medical staff that front cuffing was no longer necessary. Dr. Ashraf avers that based on his experience, training, and Dr. Carls' examination notes, front cuffing was no longer a medical necessity. Plaintiff's mere disagreement with Ashraf's medical opinion is insufficient to state a claim. Moreover, plaintiff does not allege that he was injured as a result of the failure to handcuff him in front after August 31, 2017.

When viewing the evidence as a whole and in the light most favorable to plaintiff, no evidence exists that the conduct alleged amounted to deliberate indifference by the named medical providers. *See Estelle*, 429 U.S. at 105-06 (holding that an inadvertent failure to provide adequate medical care does not amount to deliberate indifference). Indeed, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)).

### IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment will be GRANTED, and judgment will be ENTERED in favor of defendants and against plaintiff. A separate Order follows.

February 5, 2019  /s/
Date  Ellen L. Hollander
 United States District Judge